Filed 10/25/23  P. v. Pineda CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>JAIME PINEDA,<br><br>　　　Defendant and Appellant. | A163880<br><br>(Contra Costa County<br>Super. Ct. No. 05-201610-3) |

A jury convicted defendant Jaime Pineda of 10 counts of child molestation involving the daughter of his longtime friend:  three counts of aggravated sexual assault on a child (counts 1 through 3); four counts of aggravated lewd acts on a child (counts 4 through 8); one count for lewd act on a child (count 9); and one count of contact with a minor for a sexual offense (count 10).  He was sentenced to state prison for a term of 45 years to life, plus 28 years.

On appeal, defendant argues (1) there is insufficient evidence that he used force, duress, menace, or fear to support counts 1 through 8; (2) the trial court misinstructed the jury by not defining the term "force" as to counts 1 through 3; (3) the court misinstructed the jury by failing to give a modified instruction regarding unanimity as to counts 4 through 8; (4) he is entitled to resentencing as to counts 7 through 9 in light of Senate Bill No. 567 (2021–

1

2022 Reg. Sess.) (Senate Bill 567); and (5) the imposition of consecutive sentences for counts 1 through 3 was unconstitutional. We affirm.

## BACKGROUND

### The Evidence at Trial

#### *Prosecution Case*

##### Jane Doe's Testimony

Jane Doe was born in March 2007 and was 14 years old when she testified at trial. Defendant was a close friend of, and around the same age as, Doe's father.

Doe described a period of sexual encounters with defendant, beginning in the summer of 2018 when she was 11 years old. At that time, Doe lived with her father, mother, and younger brother in a studio in Richmond. The studio had been converted from a garage and was attached to the main house, where defendant, his mother, sisters, niece, and cousins lived. A door connected the living room in the studio to the kitchen in the main house.

In late May 2018, Doe's brother was born prematurely and required hospitalization for approximately four months. Doe's parents spent much of their time at the hospital during these months. They wanted Doe to stay home and had defendant's mother watch her.

Some time that summer when her parents were at the hospital, Doe, who had a friend name Jaime (the same name as defendant's), contacted defendant on Instagram, mistakenly thinking he was her friend. She received a response from defendant and apologized for contacting him. Defendant replied, stating that she was "probably trying to contact [her] boyfriend."

Defendant continued to message Doe on Instagram, asking if he could come over to her part of the house and said he wanted a kiss from her. This

2

made Doe uncomfortable. She did not want to do what defendant asked. Defendant would then come knocking on the windows when she was alone. This scared Doe, who told him to leave and did not let him in. He still kept asking over Instagram to kiss her, and she continued to say no. But there came a time when she was alone and let defendant inside, at which time he kissed her on the mouth.

For another two to four weeks, defendant continued to go to the studio and kiss Doe. Doe was scared because she had never kissed anyone before. She wanted to tell her parents about it but felt she could not.

After weeks of kissing, defendant told Doe he wanted to have "intimate relations" with her, meaning sex. Doe was uncomfortable, as she did not know what the word "sex" meant. Throughout the summer, defendant kept asking Doe about sex, and Doe would say no.

However, one day, without asking, defendant went over to Doe's studio. He then proceeded to take off her clothes and his own clothes, took her to the bed, put on a condom on his penis, and then inserted his penis into her vagina, which "hurt [her] a lot." After one or two minutes, defendant's son knocked on the window, and so he stopped, got dressed, and left.

One or two days after, defendant went back to the studio and again had intercourse with Doe. He told her not to tell anyone about what happened, and that she could not tell her parents. Doe was scared. She "didn't know anything" and "felt like if [she] was trapped."

After the second time they had sex, defendant went back to the studio and had sex with Doe again.

Between May 2018 and January 2020, defendant tried to have sex with Doe on a weekly basis. She recalled that while her brother was in the hospital, defendant would go to Doe's studio and have sex with her.

3

Defendant kept in touch with Doe over Instagram, asked her to send naked photos of herself, and told her at the end of each day of messaging to delete their messages so that her parents would not find the messages. Doe did not like defendant and did not ever think she was in a relationship with him.

In October 2018, Doe's brother came home after months of being in the hospital. Her father worked shifts as a delivery truck driver from around 4:00 a.m. until around 3:00 or 4:00 p.m. Her mother did not work at this time, and stayed home to watch Doe's brother.

In January 2019, defendant provided Doe with a Motorola cell phone so that he could communicate with her. Defendant again told Doe not to tell her parents about what was happening, which scared her, such that she could not sleep on some nights. She was "afraid something bad might happen to [her] parents." Defendant told Doe to give him the phone every time it had no charge; he did not want Doe to charge it herself because her parents would find out about it. In addition to the cell phone, defendant gave Doe gifts, including a ring and a stuffed animal.

In March, Doe turned 12 years old. Although her brother was no longer at the hospital, he still had many medical appointments to attend. Doe's mother would take her brother to his appointments, and her father would be at work. And so, Doe would sometimes be at home by herself for 20 to 30 minutes. During that 20-to 30-minute window, defendant would go to Doe's studio and have intercourse with her. This occurred more than two, but less than five, times that month.

In late May, the day before Doe's brother's birthday, her parents and brother went to the airport to pick up her uncle and cousin. Defendant went to their studio, where Doe was by herself. He put her on her knees, told her

4

to open her mouth, put his penis in her mouth, and used his hands to move her head backwards and forwards.  Doe felt like she was going to choke, and she wanted to vomit.  Defendant told her not to say anything.  In addition, defendant put his mouth on Doe's vagina.  Defendant also put Doe on the bed and had intercourse with her, which hurt her a lot.

In the month of May, defendant had intercourse with Doe less than five times.

Some time that summer, Doe's mother found a love letter that defendant had told Doe to write, prompting Doe's parents to watch her more closely and not leave her home alone anymore.  Defendant then took back the cell phone he had given Doe, who "felt great" about no longer having the phone.

However, on one occasion in July, while Doe's father was at the store, her mother stepped outside briefly, and her uncle was in the kitchen, defendant opened the door to Doe's studio, had her go to his kitchen in the main house, and started kissing her.  Defendant's niece saw them kissing.  Defendant's mother found out about the kissing and told Doe's parents about it.  Doe did not tell her mother about what defendant was doing to her, explaining she was afraid to tell her mother because defendant told her not to say anything.

Around the time that Doe went back to school that Fall, defendant gave Doe another cell phone.  On the phone, he installed an application called "Signal," which they used to message each other.

In September, Doe's teacher discovered she had a cell phone and told her parents about it.  Her parents then started watching Doe more carefully.  Because of this, defendant handed Doe a sleep-inducing powder and told her to put it in her father's drink.  She did not do so and threw it away.

In October, defendant continued giving Doe the powder and telling her to put it in her father's drink. Again, she threw it away. In addition, defendant placed a GPS tracker on Doe's father's car so that "he could have more time" with her. Defendant would go to Doe's studio and show her his phone, which was tracking her father's location in real time. Based on Doe's father's location, defendant timed when he engaged in sex acts with Doe. He had intercourse with her less than five times in October.

In November, defendant was still telling Doe to put the powder in her father's drink and using the GPS tracker to follow Doe's father around. Defendant had sex with Doe five or fewer times. And in December, defendant had sex with Doe two times.

Between May 2019 and January 2020, defendant had Doe put her mouth on his penis between 10 and 20 times.

On January 10, 2020, when Doe's parents were at work and she was babysitting her brother at home, defendant went over to their studio. He sat down on the couch, started looking at his phone, and saw on the GPS tracker that Doe's father was far away from home. Defendant told Doe to leave her brother in the kitchen, took her to the bedroom, undressed Doe and himself, and engaged in intercourse with her. Defendant then put a liquid on Doe's back and, without warning, put his penis into her anus, which caused her "so much pain." Afterwards, defendant put Doe on her knees and inserted his penis into her mouth.

On January 13, Doe told her parents that she had a sexual relationship with defendant, and they went together to speak to the police. Initially, Doe told police she had only kissed defendant and denied he had touched her. However, in later interviews, she told police that defendant had sex with her, that he had put his penis in her mouth, and that they had anal

6

sex.

Doe's father found the Instagram messages between defendant and Doe, printed out the messages, and gave the printouts to the police. He also found the second cell phone that defendant had given Doe, but the phone had apparently been wiped clean.

### Jane Doe's Father's Testimony

Eli A., Doe's father, testified that his son was born prematurely. He and Doe's mother were concerned for their son's survival and for about four months, would go to the hospital to be with him every day. During this time, Eli worked from 5:00 a.m. until anytime between 1:00 p.m. to 3:00 p.m., and then would go to the hospital from 4:00 p.m. to 10:00 p.m. At first, they would take Doe with them to the hospital, but they stopped doing so because she was missing class. Doe's parents paid defendant's mother to keep an eye on Doe and pick her up from school, but Doe would be left alone at home sometimes.

Eli testified that since 2000 he had known defendant, who was a best friend and "like a brother." Eli was also close to defendant's family, as both families had emigrated here from close towns in El Salvador. Defendant's mother said that Eli's children were like her grandchildren. Eli let defendant borrow his car to see defendant's son, because Eli "felt [defendant's] son was as important as [Eli's] son to [Eli]." Eli also testified, "I thought that [defendant] look[ed] at [Eli's] children as if they were [defendant's] own children."

In 2019, when his wife told him that defendant's niece saw Doe and defendant kissing, Eli spoke to Doe about it. He did not speak to defendant about it, as he instead chose to watch defendant more closely and confirm on his own whether Doe and defendant had a relationship.

7

Between 2016 and 2018 Doe did not have a cell phone. Eli had taken away her previous cell phone so that she could focus on school. However, in the fall of 2019, he received a call from one of Doe's teachers, who told him that she had a phone, which was not permitted. At that time, Doe did not tell her father about her relationship with defendant. She would later explain to her father that she was afraid to do so.

On January 13, 2020, Eli found Doe's cell phone amongst her clothing. When Doe told Eli who had given her the phone, he took her to the police to report it. When police first spoke to Doe, she mentioned only that defendant had kissed her. Eli then went to Doe's school that afternoon and was told by a girl at school that Doe had an Instagram account. Doe eventually gave Eli her Instagram account login and password. Eli logged in and found messages between defendant and Doe from 2018 through 2019 that showed "they were indeed having a relationship." After he saw the messages, Doe told her father about her sexual relationship with defendant and started to cry. They went back to the police to report this.

Eli testified that Doe was scared, and defendant had threatened her. "She said that [defendant] had told her that if she said anything about what was going on, her father would pay for it."

**Law Enforcement Testimony**

David Mathers, an inspector with the Contra Costa County District Attorney's Office assigned to investigate Internet crimes against children, testified he was familiar with the "Signal" application, which was used by defendant to message Doe. As part of his investigations, Mathers would use Signal and pose as a child and communicate with adults. Parties who have Signal on their devices are able to engage in secure communication using encryption, such that the messages cannot be read by anybody outside of the

8

chain of communication. Another feature of Signal is that it allows the sender of a message to delete the message even after the other person receives it. The encryption system for Signal is incredibly strong; it is based on similar technology that the federal government uses for operations requiring secure communications, such as, for example, military communications. Signal can be downloaded for free on regular application stores.

### *Defense Case*

The defense's theory at trial was that defendant "is guilty" of engaging in sexual acts with Doe, but "not guilty of aggravated sexual assault or doing anything forcible with [her]." The defense argued that Doe was the one who was in love with defendant and that they essentially had a consensual romantic relationship.

### Defendant's Family's Testimony

Defendant's niece H.M., who was about the same age as Doe, testified that she and Doe would play outside together at the Richmond residence where they all lived. One day, H.M. saw defendant and Doe kissing and told her aunt about it.

Defendant's sister Nelly P. testified that H.M. had told her about seeing Doe and defendant kissing. Nelly saw a love letter that had hearts and the initials of both defendant and Doe. The letter said that Doe "was in love with him and she was going to do everything for him and to trust her." At that time, defendant was 33 years old, and Doe was 11 years old. Nelly told her mother about the kiss, but did not contact authorities.

Defendant's mother Alma O. knew Doe's family from El Salvador and was close to Doe. After Nelly told her about defendant's inappropriate contact with Doe, defendant's mother talked to Doe and her mother. She also

9

talked to defendant and told him not to kiss an 11-year-old because it was illegal. Defendant told her he was not in any relationship with Doe and that she was the one always seeking him out.

### Defendant's Testimony

Defendant testified that Doe's father was one of his best friends and had known him since they were teenagers living in El Salvador.

In June 2018, defendant moved into a house in Richmond, the same house where Doe and her family were living. That was the first time he met Doe, whom he saw play games with his niece H.M. At that time, defendant was 33 years old, 22 years older than Doe.

When he moved into the Richmond house, defendant knew that Doe's parents had suffered an early birth of their son. He also knew that Doe was spending a lot of time alone because her parents were at the hospital with her brother. Defendant agreed he started a relationship with Doe during this time. Defendant recalled the first time that Doe had sent him a message on Instagram. He first kissed Doe in July 2018.

In the weeks that followed, defendant would message Doe and tell her he wanted to kiss her. Besides kissing, defendant admitted he had vaginal sex with Doe several times when she was alone. He also admitted to having oral sex and anal sex with Doe.

Defendant recalled that in mid-to-late August 2018, he had vaginal intercourse with Doe for the first time. At that time, he entered Doe's home when she was alone, took her to the bedroom, took off her clothes, took off his own clothes, put on a condom, and then engaged in vaginal intercourse with her. Defendant knew she was in pain when this happened. He had to guide her through each step of what was happening because she did not understand what was happening. He testified "it's possible" he had told her not to tell

10

anybody what had just happened because he did not want to get caught.

There were other, multiple occasions in August 2018 in which defendant had vaginal intercourse with Doe. He did not recall how many times he had sex with Doe between that time and the time he was arrested in January 2020.

Defendant testified that Doe performed oral sex on him more than ten times in 2019. According to defendant, Doe liked giving him oral sex. He also testified that he would place his hands on her head when she performed oral sex on him.

Also according to defendant, he and Doe were "boyfriend and girlfriend." He told Doe that he loved her "many times." They also talked about how he was going to wait until she became age of majority and marry her. Doe never told him that she did not want to have sex with him.

Defendant told Doe to delete their messages at the end of each day because he did not want to be caught by Doe's father or the police. When Doe was 12 years old, defendant bought her a small cell phone because he did not want to be caught. Defendant downloaded the "Signal" application on the phone before giving it to her. He knew that Signal was encrypted on both ends, and therefore there was no way anybody else was going to see the conversations he was having with Doe. Defendant denied ever threatening Doe.

Defendant said that his relationship with Doe was not the first time he has had a relationship with a girl under the age of 15. When he was 26 and living in El Salvador, he attempted to have a sexual relationship with a 14-year-old girl. They could not have sex because they were in a car. He told her their relationship had to be kept a secret because he knew it was illegal to have that relationship.

11

When defendant was arrested in January 2020, he lied to the police. He said that Doe had called him and told him she had told the police that they had only kissed two or three times and that he should say the same thing.  Defendant did so.

**The Charges, Verdict, and Sentence**

An information charged defendant with committing the following crimes between May 1, 2018 and January 10, 2020:  aggravated sexual assault of a child by means of rape (Pen. Code, §§ 261, subd. (a)(2), 269, subd. (a)(1))[1] (count 1); aggravated sexual assault of a child by means of oral copulation (§§ 269, subd. (a)(4), 287, subd. (c)(2)(A) & (3)) (count 2); aggravated sexual assault of a child by means of sodomy (§§ 269, subd. (a)(3), 286, subd. (c)(2) & (3) (count 3); aggravated lewd act on a child (§ 288, subd. (b)(1)) (counts 4 to 8); lewd act on a child (§ 288, subd. (a)) (count 9); and contact with a minor for a sexual offense (§ 288.3, subd. (a)) (count 10). The information also alleged that counts 4 through 9 constituted substantial sexual conduct with the victim.  (§ 1203.066, subds. (a)(8), (b).)  That special allegation as to count 9 was later stricken on the People's motion.

A jury convicted defendant of all counts charged and found true the special allegation as to counts 4 through 8.

The trial court sentenced defendant to an indeterminate term of 45 years to life, plus a determinate term of 28 years.  The indeterminate term consisted of three, consecutive 15-years-to-life terms for counts 1, 2, and 3. The determinate term consisted of the upper terms for counts 7 through 9 (10 years, 10 years, and eight years, respectively); the midterms for counts 4, 5, and 6 (each 8 years); and the midterm for count 10 (three years), with the

---

[1] Further undesignated statutory references are to the Penal Code.

sentences for counts 4, 5, 6, and 10 to run concurrently with the sentences for counts 7 through 9.

This appeal followed.

## DISCUSSION

### Substantial Evidence Supports Counts 1 through 8

Defendant first argues there was insufficient evidence of force, duress, menace, or fear to support the three counts of aggravated assault on a child (counts 1 through 3), as well as the four counts of aggravated lewd acts on a child (counts 4 through 8). We disagree.

#### *Applicable Law*

Aggravated sexual abuse of a child requires the commission of a specified act on a child who is under 14 years and at least seven years younger than the defendant. (§ 269, subd. (a).) Three of the sex acts specified are rape, oral copulation, and sodomy. (§ 269, subd. (a)(1), (3), (4)).) Convictions for these crimes require a finding that the sex acts were "accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on" the victim or another person. (*Ibid.* [incorporating §§ 261, subd. (a)(2); 286, subd. (c)(2) & (3), 287, subd. (c)(2) & (3)].)

Similarly, convictions for the aggravated lewd acts upon a child in counts 4 through 8 require a finding that the act was committed "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." (§ 288, subd. (b)(1).)

Here, defendant does not dispute that the evidence was sufficient to demonstrate that he had engaged in various sex acts with a child over the relevant time period. Indeed, at trial he admitted to doing so. However, he argues there was insufficient evidence that he committed those sex acts by

13

force, menace, fear, or duress.

At trial, the prosecution relied primarily on a theory of duress, and the People address only duress in their respondent's brief. Thus, we evaluate only whether there was substantial evidence of duress.

In the context of an aggravated lewd and lascivious act on a child under 14 years of age (§ 288, subd. (b)(1)), aggravated oral copulation (§§ 269, subd. (a)(4), § 287, subd. (c)(2)(A) & (3)), and aggravated sodomy (§§ 269, subd. (a)(3), 286, subds. (c)(2)(A) & (3), (d)), "duress" means " 'a direct or implied threat of force, violence, danger, *hardship* or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1004 (*Leal*); see CALCRIM No. 1015 (Oral Copulation by Force, Fear, or Threats); CALCRIM No. 1030 (Sodomy by Force, Fear, or Threats); CALCRIM No. 1111 (Lewd or Lascivious Act: By Force or Fear).) In the context of aggravated rape, section 261 defines "duress" in the same manner, except that it omits the term "hardship" from the definition. (§ 261, subd. (b)(1); *Leal*, *supra*, 33 Cal.4th at p. 1007; see CALCRIM No. 1000 (Rape or Spousal Rape by Force, Fear, or Threats).) However, similar factors are relevant to a determination of whether a defendant used duress to commit an aggravated sexual assault of a child based on an allegation of rape. (See *People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072 (*Thomas*).)

The jury was to determine the existence of duress by considering the totality of the circumstances. (See *People v. Veale* (2008) 160 Cal.App.4th 40, 46 (*Veale*); § 261, subd. (b); CALCRIM Nos. 1000, 1015, 1030, 1111.) "The totality of the circumstances includes the victim's age, her relationship to the perpetrator, threats to harm the victim, physically controlling the victim

14

when the victim attempts to resist, warnings to the victim that revealing the molestation would result in jeopardizing the family, and the relative physical vulnerability of the child." (*Thomas*, *supra*, 15 Cal.App.5th at p. 1072, citing *People v. Cochran* (2002) 103 Cal.App.4th 8, 13–14 (*Cochran*), disapproved on another ground in *People v. Soto* (2011) 51 Cal.4th 229, 248 & fn. 12 (*Soto*).) "The fact that the victim testifies the defendant did not use force or threats does not preclude a finding of duress." (*Thomas*, at p. 1072.) "The very nature of duress is psychological coercion." (*Cochran*, at p. 15.)

When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319, superseded by 28 U.S.C. § 2254(d) on other grounds.) In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis what[so]ever there is sufficient substantial evidence to support' " the jury's verdict. [Citation.]' [Citation.]" (*Ibid.*) " 'Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Jones* (2013) 57 Cal.4th 899, 963.)

### *Analysis*

The totality of the evidence in this case is sufficient to support a finding that defendant molested Doe by means of duress, in violation of the

aggravated sexual assault and aggravated lewd act statutes.

Doe was only 11 or 12 years old, thus more than two decades younger than defendant. In addition, defendant was a close friend of Doe's father, and Doe's parents trusted defendant's mother to watch Doe when they were away. Defendant was also physically close to Doe's family; the sex acts occurred in Doe's family's studio, which was part of and connected to the main house where defendant lived and, therefore, was easily accessible to defendant. Further, the acts occurred when Doe was alone at home, mainly because her parents had to be with her brother at the hospital or at work. All of these circumstances bear upon Doe's susceptibility to being molested by defendant.

There was also evidence that Doe feared defendant. Doe testified she was afraid of defendant and did not want to engage in the kissing or sex acts urged by defendant. Initially, defendant asked Doe if he could come over and kiss her, which made her feel scared and uncomfortable. When she reluctantly submitted to his repeated requests, he moved on to asking for intercourse, which again made her feel uncomfortable and which she initially refused. One day, without asking, defendant went to Doe's studio and proceeded to have intercourse with her. Defendant continued to engage in intercourse, as well as other sex acts such as oral copulation and sodomy, with Doe, who experienced physical pain during some of these acts. Defendant repeatedly told Doe not to tell anyone about what he was doing to her. Doe was afraid that "something bad might happen to [her] parents" and was told by defendant that "her father would pay for it" if she disclosed the abuse. Doe was so afraid that she could not sleep on some nights.

Viewing the evidence in totality and in the light most favorable to the judgment, we conclude there was substantial evidence of duress. The evidence demonstrates a vulnerable, isolated child who was compelled to

16

participate in sex acts by defendant, who held a position of trust. A jury could reasonably conclude that defendant made an implied threat sufficient to support a finding of duress, based on evidence Doe feared defendant and was afraid that if she told anyone about the molestation, defendant would harm her father or mother. (See, e.g., *Veale, supra*, 160 Cal.App.4th at p. 47.)

Defendant nonetheless argues there is insufficient evidence of duress, relying on *People v. Hecker* (1990) 219 Cal.App.3d 1238 (*Hecker*), overruled in part in *Soto, supra*, 51 Cal.4th at page 248, footnote 12, and cases citing it, such as *People v. Espinoza* (2002) 95 Cal.App.4th 1287 (*Espinoza*).

In *Hecker*, the defendant began molesting his stepdaughter when she was twelve years old. (*Hecker, supra*, 219 Cal.App.3d at p. 1241.) The court found insufficient evidence of duress where there was no evidence that the defendant expressly or implicitly threatened the victim; the victim admitted she was never consciously afraid defendant would harm her and testified that with the exception of defendant's pushing her head down during the act of oral copulation, he never used physical force. (*Id.* at p. 1250.) Also, although the victim stated she felt " 'pressured psychologically' " and was " 'subconsciously afraid,' " there was no evidence defendant was aware of and sought to take advantage of such fear. (*Ibid.*) The *Hecker* court observed, " '[p]sychological coercion' without more does not establish duress. At a minimum there must be an implied threat of 'force, violence, danger, hardship or retribution.' " (*Id.* at pp. 1250–1251.)

In *Espinoza*, the defendant was convicted of sexually abusing his 12-year-old daughter, who had recently moved in with him and resided there for one month. (*Espinoza, supra*, 95 Cal.App.4th at pp. 1292–1294.) Relying on *Hecker*, the *Espinoza* court found insufficient evidence of duress, because there was no evidence of a " 'direct or implied threat' of any kind." (*Espinoza*,

at p. 1321.)  The court reasoned that the defendant did not grab, restrain, or corner the victim, and the victim did not cry or resist while defendant lewdly touched her and attempted intercourse with her.  (*Id.* at p. 1320.)  It stated: "While it was clear that [the victim] was afraid of defendant, no evidence was introduced to show that this fear was based on anything defendant had done other than to continue to molest her.  It would be circular reasoning to find that her fear of molestation established that the molestation was accomplished by duress based on an implied threat of molestation."  (*Id.* at p. 1321.)

Defendant's reliance on *Hecker* and *Espinoza* is misplaced.  For one, the reasoning of those cases has been questioned by subsequent decisions.  In *Cochran*, the same court that decided *Hecker* subsequently disagreed with the statement in *Hecker* that psychological coercion, without more, is insufficient to support a finding of duress.  (*Cochran*, *supra*, 103 Cal.App.4th at p. 15.)  The *Cochran* court found that the language used in *Hecker* was "overly broad," and clarified that "[t]he very nature of duress is psychological coercion."  (*Ibid.*; see *Veale*, *supra*, 160 Cal.App.4th at pp. 47–48 [distinguishing *Hecker* and *Espinoza* on the basis of *Cochran*].)  Also, our Supreme Court later approved a definition of duress in child molestation cases that parallels *Cochran*, not *Hecker*, describing duress as "us[ing] some form of psychological coercion to get someone else to do something."  (*Soto*, *supra*, 51 Cal.4th at p. 243.)  We thus agree with *Cochran* that a finding of duress does not necessarily require something more than psychological coercion.

Further, *Hecker* and *Espinoza* are distinguishable.  Unlike the victim in *Hecker*, Doe in this case testified she was actually afraid of defendant.  And unlike in both *Hecker* and *Espinoza*, the record here contains evidence of an

18

implied threat of not only defendant's continued molestation of Doe, but also of retribution to her family were she to disobey defendant's demands that she not tell anyone about the abuse. As noted, Doe's father testified that defendant had told Doe not to tell anyone about the abuse or else her father would "pay for it." And Doe testified that she was afraid that "something bad might happen" to her parents if she disclosed the abuse. Although defendant acknowledges this evidence, he suggests that neither the testimony of Doe nor her father was credible, and that we should instead credit defendant's own testimony that he told Doe not to tell anyone simply because he did not want to get in trouble with the police or with her father. We decline his invitation to reweigh the evidence, which is in violation of the principles of substantial evidence review. (*People v. Manibusan*, *supra*, 58 Cal.4th at p. 87.)

In short, there was substantial evidence that defendant used duress when committing the offenses in counts 1 through 8. Because the record contains substantial evidence supporting a finding of duress, we need not reach defendant's assertions of whether there was also sufficient evidence that he used force, menace, or fear to accomplish the challenged convictions. (See *Cochran*, *supra*, 103 Cal.App.4th at p. 16 ["Since we have found duress, we need not discuss whether force was also present"]; see also §§ 269, subd. (a), 261, subd. (a)(2), 286, subd. (c)(2), 287, subd. (c)(2), 288, subd. (b)(1) [the act is deemed an aggravated offense if it is accomplished "by means of force, violence, duress, menace, *or* fear of immediate and unlawful bodily injury"], italics added. )

### The Court Did Not Err In Failing to Sua Sponte Give Additional Instruction on Force

With respect to the aggravated sexual assault offenses charged in counts 1 through 3, the trial court instructed the jury using CALCRIM

19

Nos. 1000, 1015, and 1030, respectively.  These instructions state that an element of the crime of aggravated sexual assault of a child is that the defendant "accomplished the [intercourse, oral copulation, or sodomy] by force, duress, menace, or fear of immediate and unlawful bodily injury to someone."  (CALCRIM Nos. 1000, 1015, 1030.)  The jury was instructed on this element, along with the definition of "duress," but not "force" (or "menace" or "fear").  Defendant argues that the trial court erred in failing to sua sponte instruct the jury on the definition of "force" in connection with the aggravated sexual assault offenses charged in counts 1 through 3.

We review defendant's claim of instructional error de novo (*People v. Waidla* (2000) 22 Cal.4th 690, 733), and conclude it lacks merit.

Defendant argues that the trial court should have instructed the jury with the bracketed definition of force provided in CALCRIM Nos. 1000, 1015, and 1030 as follows:  "[[the particular sex act] is accomplished by force if a person uses enough physical force to overcome the woman's will]."

However, defendant acknowledges that the Bench Notes in CALCRIM Nos. 1000, 1015, and 1030 state:  "The term 'force' as used in the [forcible sexual offense] statutes does not have a specialized meaning and [the] court is not required to define the term sua sponte.  ([*People v.*] *Griffin* [(2004)] 33 Cal.4th [1015,] 1023–1024 [(*Griffin*)].)"  The Bench Notes explain that in the context of aggravated sexual assault of a child based on rape:  "In *People v. Griffin,* [*supra,*] the Supreme Court further stated, [¶] [n]or is there anything in the common usage definitions of the term 'force,' or in the express statutory language of section 261 itself, that suggests force in a forcible rape prosecution actually means force '*substantially* different from or *substantially* greater than' the physical force normally inherent in an act of consensual sexual intercourse.  [Citation.]  To the contrary, it has long been recognized

20

that 'in order to establish force within the meaning of section 261, subdivision (2), the prosecution need only show the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the [victim].' [Citation.]" (CALCRIM Nos. 1000, 1015, and 1030, citing *Griffin*, at pp. 1023–1024.) Cases have held that these concepts in *Griffin* apply equally to the crimes of aggravated oral copulation (*People v. Guido* (2005) 125 Cal.App.4th 566, 576) and aggravated sodomy (*People v. Hale* (2012) 204 Cal.App.4th 961, 977–979).

Defendant further acknowledges that the Bench Notes in CALCRIM Nos. 1000, 1015, and 1030 also state that the Judicial Council "has provided a bracketed definition of 'force,' consistent with . . . *Griffin*, *supra*, that the court may give *on request*." (CALCRIM Nos. 1000, 1015, and 1030, italics added.)

Finally, defendant acknowledges that he did not request the additional instruction on force in the trial court.

We find no error in the trial court failing to give the bracketed instruction on "force" in connection with counts 1 through 3 because defendant did not request it or otherwise object to the instructions as given. As defendant admits, the trial court had no sua sponte duty to so instruct. (See *Griffin*, *supra*, 33 Cal.4th at pp. 1023–1024; accord, *People v. Guido*, *supra*, 125 Cal.App.4th at p. 576; see also CALCRIM Nos. 1000, 1015, and 1030.)

And even assuming the court's omission was error, it was harmless under the *Chapman* standard or the *Watson* standard.[2] Defendant does not

---

[2] Errors that are a matter of state law only are subject to the standard in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which requires reversal if "it is reasonably probable that a result more favorable to

argue the jury was improperly instructed on duress and, as discussed *ante*, there was substantial evidence of duress to sustain counts 1 through 8. Therefore, we conclude that the court's failure to give a specialized definition of force would not have changed the outcome of the jury's verdicts on counts 1 through 3.

### The Failure to Give the Modified Unanimity Instruction Was Harmless

Defendant next argues the trial court erred in instructing the jury on the requirement of unanimity using CALCRIM No. 3500, instead of CALCRIM No. 3501. The People argue the trial court properly instructed the jury and, in any event, any error was harmless. We conclude that any error in failing to instruct the jury using CALCRIM No. 3501 was harmless.

#### *Applicable Law*

A criminal defendant's right to a jury trial includes the right to a unanimous agreement, including unanimous agreement on the act constituting the offense charged. (Cal Const., art. I, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132.) In any case in which the evidence would permit jurors to find the defendant guilty of a crime based on two or more discrete acts, either the prosecutor must elect among the crimes, or the court must require the jury to agree on the same criminal act. (*People v. Russo*, *supra*, 25 Cal.4th at p. 1132.) This unanimity requirement " 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]" (*Ibid*.) Where it is warranted, the court must give the instruction

---

[defendant] would have been reached." Errors that amount to federal constitutional error are subject to review under the *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) standard, which requires reversal unless the error is harmless beyond a reasonable doubt.

22

sua sponte.  (*People v. Riel* (2000) 22 Cal.4th 1153, 1199.)

Here, based on CALCRIM No. 3500, the standard instruction on unanimity, the trial court instructed the jury:  "The defendant is charged with separate offenses in Count[s] 1-10.  [¶]  The People may have presented evidence of more than one act to prove that the defendant committed each of these offenses.  With regards to each separate charge, you must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

In *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*), our Supreme Court addressed how to instruct a jury on the requirement of a unanimous verdict in child molestation cases.  *Jones* was particularly concerned with the typical situation in which the victim gives "generic" testimony about the abuse, meaning "the victim typically testifies to repeated acts of molestation occurring over a substantial period of time but, lacking any meaningful point of reference, is unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assaults" (e.g., "an act of intercourse 'once a month for three years' ").  (*Id.* at pp. 299, 314.)  The court rejected "the contention that jury unanimity is necessarily unattainable where testimony regarding repeated identical offenses is presented in child molestation cases.  In such cases, although the jury may not be able to readily distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described."  (*Id.* at p. 321.)  Thus, the court concluded, a victim must only provide evidence with respect to the kind of act or acts committed, the number of acts, and the general timeframe in which the acts occurred.  (*Id.* at p. 316; see *ibid.* [While "[a]dditional details regarding the time, place or circumstance of the various

23

assaults may assist in assessing the credibility or substantiality of the victim's testimony," they are "not essential to sustain a conviction"].)  So long as the victim does so, there is "no constitutional impediment to allowing a jury, so instructed, to find a defendant guilty of more than one indistinguishable act . . . ."  (*Id*. at p. 321.)

To safeguard the constitutional requirement of unanimity under these circumstances, the *Jones* court further directed as follows:  "In a case in which the evidence indicates the jurors might disagree as to the particular act defendant committed, the standard unanimity instruction should be given.  [Citation.]  But when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim."  (*Jones*, *supra*, 51 Cal.3d at pp. 321–322.)

Pursuant to *Jones*, the Judicial Council adopted CALCRIM No. 3501, which provides:  "The defendant is charged with <insert description[s] of alleged offense[s]> [in Count[s] __] sometime during the period of _____ to _____.  [¶]  The People have presented evidence of more than one act to prove that the defendant committed (this/these) offense[s].  You must not find the defendant guilty unless:  [¶]  1.  You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed [for each offense];  [¶]  OR  [¶]  2.  You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved that the defendant committed at least the number of

24

offenses charged].' "

Thus, "CALCRIM No. 3501 affords two different approaches for the jury to reach the required unanimity. The first is the same as that set forth in CALCRIM No. 3500: agreement as to the acts constituting each offense. But unanimity may also be found under CALCRIM No. 3501 if the jury agrees 'that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved that the defendant committed at least the number of offenses charged].' " (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 556.)

We review the failure to give the proper unanimity instruction de novo. (*People v. Waidla, supra*, 22 Cal.4th at p. 733.)

### *Analysis*

Defendant argues the trial court should have instructed the jury using CALCRIM No. 3501, instead of CALCRIM No. 3500, with respect to the aggravated lewd act charges in counts 4 through 8, because those charges were based on generic testimony from Doe.[3] Defendant suggests Doe's testimony was the type of testimony addressed by the Supreme Court in *Jones* and for which the modified unanimity instruction contained in CALCRIM No. 3501 was drafted.

As explained by the prosecutor in closing argument, count 4 was for when Doe performed oral sex on defendant in 2019, which Doe explained happened between 15 to 20 times. Count 5 was for the oral sex that defendant performed on Doe around the time of her brother's birthday in late 2019, when her family went to the airport to pick up Doe's uncle and cousin. Count 6 was for the times in 2019 when defendant engaged in intercourse

---

[3] Defendant did not object to the instruction of the jury with CALCRIM No. 3500 or propose instruction of the jury instead with CALCRIM No. 3501.

25

with Doe, which the prosecutor described as a "month-to-month ratio, or frequency." Doe was asked month by month whether defendant had sex with her, and she testified to a range of times he had done so. Count 7 was for the times in 2018 when defendant engaged in intercourse with Doe, which she testified occurred (without specifying how many times) when her family attended her father's soccer games without her in October and November. Finally, count 8 was for the first time that defendant raped her in August 2018.

As reflected above, the evidence presented in support of counts 4 through 8 was a mix of generic and specific testimony. The evidence in support of counts 5 and 8 was specific. The evidence in support of counts 4, 6, and 7 were generic in nature and the prosecutor did not elect a specific act for each of those counts. Given this, CALCRIM No. 3501 would have been the more appropriate instruction to give as to counts 4, 6, and 7.

However, any error in not instructing the jury with CALCRIM No. 3501 was harmless beyond a reasonable doubt.[4] As explained in the context of a completely omitted unanimity instruction, when " 'the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that defendant committed all acts if he committed any, the failure to give a unanimity instruction is harmless . . . [beyond a reasonable doubt]. [Citation.] Where the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted

---

[4] There is a split of authority whether courts should apply *Chapman* or *Watson* in assessing prejudice due to a court's failure to give an unanimity instruction. (See *People v. Smith* (2005) 132 Cal.App.4th 1537, 1545 & fn. 7.) As both parties apply the more stringent *Chapman* standard, we will do so here as well.

26

him of any of the various offenses shown by the evidence, the failure to give the unanimity instruction is harmless. [Citation.]" (*People v. Curry* (2007) 158 Cal.App.4th 766, 783.) Put another way, the failure to give the unanimity instruction is harmless error where " 'the jury's verdict implies that it did not believe the only defense offered.' " (*People v. Deletto* (1983) 147 Cal.App.3d 458, 468.)

Here, the defense did not present any evidence or argument that might focus doubt as to any specific act of abuse as distinguished from any other act of abuse. Indeed, defendant admitted that he had engaged in all of the sex acts described by Doe. His only defense was that the sex acts were consensual and, therefore, he committed *none* of the aggravated lewd act charges against him. As such, the defense did not discuss *how many* different lewd acts occurred. Rather, both the prosecutor and defense counsel focused their argument on why the jury should accept or reject Doe's testimony in its entirety. The jury's guilty verdicts on all counts indicate they believed Doe and rejected the only defense offered—they concluded that defendant had committed everything of which he was accused. Accordingly, it is not likely the jury disagreed as to particular acts committed. Thus, the failure to instruct the jury with CALCRIM No. 3501 was harmless beyond a reasonable doubt.

**Defendant Is Not Entitled to Resentencing Under Senate Bill 567**

Defendant argues we must vacate his sentences on counts 7 through 9 and remand for resentencing in light of the legislative changes made by Senate Bill 567. The People agree Senate Bill 567 applies retroactively, but argue remand is unnecessary because any error was harmless. We agree with the People.

27

### *Additional Background*

As explained by the prosecutor at trial, counts 7 through 9 were based on defendant's conduct during the latter half of 2018, a majority of which was spent by Doe's parents and brother at the hospital.

The probation report listed three factors in aggravation: the victim was particularly vulnerable (Cal. Rules of court[5], rule 4.421(a)(3)); the manner in which the crime was carried out indicates planning, sophistication, or professionalism (rule 4.421(a)(8)); and defendant took advantage of a position of trust or confidence to commit the offense (rule 4.421(a)(11)). The report listed one mitigating factor: defendant's lack of a prior criminal record. (Rule 4.423(b)(1).)

In October 2021, the trial court sentenced defendant to the upper terms on count 7 (10 years), count 8 (10 years), and count 9 (eight years). In doing so, the court observed:

"This is a case in which the defendant chose to victimize a particularly vulnerable victim, a very young girl who he established a relationship with because of traumatic events in the girl's family's lives and because he was friends with her dad and he took advantage of those position of trust and— the victim was not just vulnerable because she was young but because of the circumstances that exposed her to great vulnerability.

"And it's particularly despicable that the defendant would have taken advantage, and that's not even giving it a fair assessment of that situation in the most horrible way. . . . [I]f we were to liken our society to fabric, then he gashed a hole into the fabric of our society that will last for generations. That young girl—her parents, they will not trust anyone for decades probably to

---

[5] Further undesignated rule references are to the California Rules of Court.

28

come close to their family.  They will not trust them or their kids, their grandchildren or their great grandchildren to be alone with a person again.  It's a horrible gash in the fabric of that family, multigenerational.

"And it's a horrible factor in aggravation.  The defendant used sophisticated means to bring the young girl under his power.  He exposed her to things that she should not have been exposed to at that age, and for many years after, ever.  There were opportunities to reflect in between each time he committed these offenses because they went on for many months.  And after reflection, he re-committed the offenses.  In fact, they became more aggravating as they progressed. [¶] . . . [¶]

"And as I look at the factors in mitigation, [it] appears the only factor in mitigation of any significance is that the defendant hasn't been convicted of any crimes before, but those factors in mitigation pale in comparison to the factors in aggravation.  For those reasons, I'm going to impose the aggravated terms."

### *Applicable Law*

At the time of sentencing, the decision to impose the lower, middle, or upper term for an offense with a sentencing triad rested "within the sound discretion" of the trial court based on its determination of what "best serves the interests of justice."  (Former § 1170, subd. (b), as amended by Stats. 2020, ch. 29, § 14.)

Effective January 1, 2022, Senate Bill 567 amended section 1170, subdivision (b) by making the middle term the presumptive sentence for a term of imprisonment absent the existence of certain specified circumstances.  (Stats. 2021, ch. 731, § 1.3, adding Pen. Code, § 1170, subd. (b)(1) & (2).)  The amended statute now provides that a trial court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation

29

of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).)

The parties agree, as do we, that the amendments to section 1170 made by Senate Bill 567 retroactively apply to the upper term sentences imposed on counts 7 through 9. (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038–1039; *In re Estrada* (1965) 63 Cal.2d 740, 745.)

Defendant contends the trial court did not sentence him in accordance with amended section 1170, because the aggravating circumstances cited by the court when sentencing him to the upper terms on counts 7 through 9 were not based on facts that were stipulated to by defendant or found true beyond a reasonable doubt by the jury. The People do not dispute this, but assert remand is not required because any error was harmless.[6]

There is a split of authority regarding the standards for determining whether error arising from retroactive application of Senate Bill 567 is harmless.

In *People v. Flores* (2022) 75 Cal.App.5th 495 (*Flores*), Division Three of this District held " 'if a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard,

---

[6] Defendant presents no argument as to whether the error was harmless, even though the cases described below applying harmless error analysis to a Senate Bill 567 challenge were decided prior to the filing of his opening brief. And because he did not file a reply brief, he has not refuted the People's assertions of harmless error. Thus, any claim that defendant was prejudiced by the court's noncompliance with Senate Bill 567 has been forfeited. However, as we explain, on this record, he would not be able to establish prejudice in any event.

unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury,' the error is harmless." (*Id.* at p. 500.)

In *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*), the Fourth District, Division One, concluded the standard in *Flores* was incomplete and instead, to find harmless error, a reviewing court must conclude beyond a reasonable doubt a jury would have found beyond a reasonable doubt *every* aggravating factor upon which the trial court relied at the time of sentencing. (*Id.* at pp. 465–466; see *id.* at p. 467, fn. 11.) If so, the error is harmless; if not, the reviewing court considers whether it is reasonably probable the trial court would nevertheless have exercised its discretion to select the upper term "based on a single permissible aggravating factor or on some constellation of permissible aggravating factors," rather than all of the factors on which it previously relied. (*Id.*, at p. 468; see *id.* at p. 467, fn. 11.)

After *Lopez*, the court that decided *Flores* abandoned its approach in favor of the *Lopez* analysis. (*People v. Ross* (2022) 86 Cal.App.5th 1346, 1355, fn. 8, review granted Mar. 15, 2023, S278266).)

In *People v. Dunn* (2022) 81 Cal.App.5th 394 (*Dunn*), review granted October 12, 2022, S275655, the Fifth District added a slight variation on the *Lopez* standard. As *Dunn* articulated the test: "[t]he reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt. If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless. If not, the reviewing court . . . [determines] (2) whether there is a reasonable

31

probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps.  If the answer is no, the error was harmless.  If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent with section 1170, subdivision (b)."  (*Dunn*, at pp. 409–410, fn. omitted.)

The harmless error issue is currently pending before the California Supreme Court in *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.] review granted August 10, 2022, S274942.

### *Analysis*

The People urge us to apply the standard for harmless error set forth in *Dunn*, rather than in *Lopez*.  As we have done in prior cases (see *People v. Wandrey* (2022) 80 Cal.App.5th 962, 982, review dismissed Aug. 30, 2023, S275942), we will apply the more stringent test of *Lopez* here.  We note, however, that our conclusion would be the same under *Dunn*:  the error here was harmless.

Rule 4.421(a) lists various circumstances in aggravation that can be considered at sentencing.  Although the trial court did not specifically refer to that rule at sentencing, the record indicates that the court, consistent with the probation report, was referring to that rule with respect to three of the aggravating factors it relied upon:  (1) the victim was particularly vulnerable (rule 4.421(a)(3)); (2) defendant took advantage of a position of trust to commit the offense (rule 4.421(a)(11)); and (3) the manner in which the crime was carried out indicates planning, sophistication, or professionalism (rule 4.421(a)(8)).  The court also mentioned factors that are not among those listed in rule 4.421(a), namely that defendant's acts ruined Doe and her family and their ability to trust anyone around the children, defendant had opportunities

32

to reflect between committing the offenses, and the crimes became more aggravated over time.

Under the first step of the *Lopez* test, we determine whether a jury would have found true beyond a reasonable doubt every aggravating factor relied upon by the trial court. " 'The failure to submit a sentencing factor to a jury may be found harmless if the evidence supporting that factor is overwhelming and uncontested, and there is no "evidence that could rationally lead to a contrary finding." ' " (*Lopez*, *supra*, 78 Cal.App.5th at p. 465.)

Here, we can comfortably conclude that a jury would have found true beyond a reasonable doubt three of the aggravating factors relied upon by the trial court: (1) the victim was particularly vulnerable; (2) defendant took advantage of a position of trust; and (3) the manner in which the crimes were committed indicated planning or sophistication.

Turning to the first factor, within the meaning of rule 4.421(a)(3), " 'a "particularly vulnerable" victim is one who is vulnerable "in a special or unusual degree, to an extent greater than in other cases." ' " (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 558.) " ' "Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." ' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 154.) A victim is considered particularly vulnerable "where the age or physical characteristics of the victim, or the circumstances under which the crime is committed, make the defendant's act especially contemptible." (*People v. Bloom* (1983) 142 Cal.App.3d 310, 321–322, fn. omitted.) "In the jargon of football players," an attack on a particularly vulnerable victim is "a cheap shot." (*People v. Smith* (1979) 94 Cal.App.3d 433, 436.)

Although our Supreme Court determined in *People v. Sandoval* (2007) 41 Cal.4th 825 (*Sandoval*), superseded by statute on another ground as stated in *People v. Lewis* (2023) 88 Cal.App.5th 1125, 1132, that in that case it could not conclude the jury would have found the victims were particularly vulnerable, it did so because the trial evidence supporting the trial court's finding—that the victims were unarmed or taken by surprise—was contested and underwhelming. (*Sandoval, supra*, at p. 842.) In so concluding, the court observed the record "does not reflect such a clear-cut instance of victim vulnerability that we confidently can conclude the jury would have made the same findings, as might be the case if, for example, the victims had been elderly, very young, or disabled, or *otherwise obviously and indisputably vulnerable*." (*Ibid.*, italics added.) Here, such a record exists.

The evidence is overwhelming and uncontested that Doe was particularly vulnerable due to not only her young age, but also the circumstances under which the crimes were committed. When she was molested, Jane Doe was 11 or 12 years old, while defendant was 33 or 34 years old. In 2018, the time period on which the challenged counts 7 through 9 are based, Doe's younger brother was born prematurely, requiring him to be admitted to the hospital for several months, and after being discharged, to attend many medical appointments. As a result, Doe's parents, when they were not at work, devoted much of their time at the hospital with their son. Not wanting Doe to miss class, her parents asked defendant's mother to watch over Doe at home. Despite this, Doe was frequently left alone. Defendant, who was Doe's father's best friend, was aware of Doe's family's situation, of his mother being in charge of Doe when she was at home, and of Doe being left alone frequently. Defendant lived in the main house that was connected to Doe's family's studio, thereby granting him easy access to Doe.

34

All of this supplies clear and indisputable evidence that Doe was particularly vulnerable to being molested by defendant.

The second factor cited by the trial court—that defendant took advantage of a position of trust (rule 4.421(a)(11))—is also supported by overwhelming and uncontested evidence. No one disputed that Doe's father and defendant had a close relationship. Doe's father and defendant had known each other since childhood and were best friends. Their families also had a close relationship, as they had come from close towns in El Salvador. Their families were not only tight-knit, but they also lived in the same house, with defendant and his family occupying the main house, and Doe's family occupying the studio attached to the main house. Doe's father testified, and defendant's mother confirmed, that she thought of Doe like her own grandchild. And Doe's father trusted defendant to be around his daughter, thinking that defendant "look[ed] at [Doe's father's] children as if they were [defendant's] own children." Given all of this evidence, we are convinced a jury would have found true beyond a reasonable doubt that defendant held a position of trust with respect to Doe and her family and that he exploited such a position to molest Doe. (Rule 4.421(a)(11).)

We reach a similar conclusion as to the third factor relied upon by the trial court: the manner in which the crime was carried out indicates planning or sophistication. (Rule 4.421(a)(8).) Defendant groomed Doe, lavishing her with attention, giving her gifts, and telling her he loved her. In addition to grooming Doe, defendant went to great lengths to effectuate the abuse and cover his tracks: he gave Doe two cell phones so that they could exchange inappropriate messages and photos, and maintained physical control of them; installed on one of the phones the Signal application, an encrypted messaging service, so that they could message each other in secret;

35

asked Doe to drug her father by putting a sleep-inducing powder in his drink so defendant could have more time with her; and installed a GPS tracker on Doe's father's car, monitored his whereabouts, and with that information planned when he would go over to Doe's studio and molest her. Based on all of this evidence, a jury would unquestionably find that the way in which defendant carried out the abuse exhibited planning or sophistication.

The remaining factors cited by the court—defendant's acts ruined Doe and her family and their ability to trust anyone, defendant had opportunities to reflect between committing the offenses, and the crimes became more aggravated over time—are not among the factors listed in rule 4.421(a). We note, however, that under rule 4.421(c), the trial court may consider "[a]ny" factor that "reasonably relate[s] to the defendant or the circumstances under which the crime was committed." With the exception of the increasing severity of the sexual assaults, the other factors are not so clear cut, as they appear to rely on somewhat subjective standards rather than a straightforward finding of facts. (See *Sandoval*, *supra*, 41 Cal.4th at p. 840.) However, we need not belabor the point because, as now discussed, even if these factors are excluded from step two of the *Lopez* analysis, there is no reasonable probability the trial court would have imposed a lower sentence on counts 7 through 9.

On this record, it is reasonably probable the trial court would have exercised its discretion to select the upper terms based on "some constellation of permissible aggravating factors" described above. (*Lopez*, *supra*, 78 Cal.App.5th at p. 468.) In sentencing defendant, the trial court gave significant weight to the victim's particular vulnerability and defendant's abuse of a position of a trust. At the outset, the court made clear it believed defendant's condut to be "particularly heinous . . . against a particularly

vulnerable person" and that he "took advantage of a trusting position to violate [Doe]." On those grounds, it found defendant ineligible for probation. The court also stated that even if it had discretion to strike any "provisions that would cause the sentence to be changed, I would not exercise that discretion because the aggravating factors in this case are severe and clearly outweigh the mitigating factors. The fact that the defendant threatened and coerced the victim into . . . going along with this because she was a child and she was particularly vulnerable, I would not be striking any terms even if I were allowed to do it." The court then added, "And if I have any discretion anywhere else, I would not be exercising [it]." Addressing counts 7 through 9, the court again referred to Doe's particular vulnerability and defendant's abuse of a position of trust and described his conduct as "particularly despicable" and as "tak[ing] advantage of that situation in the most horrible way," before imposing the upper terms on those counts. All of these comments indicate that this was not a close call, and that the court considered the particular vulnerability of the victim and position of trust especially strong. (Cf. *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1115.) Accordingly, on this record, we conclude it is not reasonably probable the trial court would have sentenced defendant differently if it had the discretion to do so at the time. We therefore will not remand the matter for resentencing pursuant to Senate Bill 567.

**The Imposition of Consecutive Sentences on Counts 1 Through 3 Pursuant to Section 667.6, Subdivision (d) Is Constitutional**

Lastly, we reject defendant's constitutional challenge to the consecutive sentences imposed on counts 1 through 3 pursuant to section 667.6, subdivision (d).

Defendant was convicted of three counts of aggravated sexual assault of a child by means of rape (count 1), oral copulation (count 2), and sodomy

(count 3). He does not dispute that these counts are listed as violent sexual offenses under section 667.6, subdivision (e)(1), thus qualifying him for sentencing pursuant to section 667.6, subdivision (d)(1). Section 667.6, subdivision (d)(1) provides: "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions." Here, the trial court imposed consecutive 15-year-to-life terms for counts 1, 2, and 3, for a total of 45 years to life. The court did not expressly find that the offenses "involve separate victims or the same victim on separate occasions." (§ 667.6, subd. (d)(1).) However, based on it imposing the consecutive sentences, we infer that it impliedly found the crimes involved the same victim on separate occasions, which the prosecution had argued in its sentencing brief.

Defendant argues that the imposition of fully consecutive sentences on counts 1 through 3 without a jury finding that the offenses were committed against separate victims or the same victim on separate occasions violated his rights to a jury trial and due process, as construed in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and *Alleyne v. United States* (2013) 570 U.S. 99 (*Alleyne*). In *Apprendi*, the United States Supreme Court held under the Sixth Amendment to the federal Constitution that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi*, at p. 490.) Under *Alleyne*, this rule applies "with equal force to facts increasing the mandatory minimum" because an increase in the minimum term heightens "the prescribed range of sentences to which a criminal defendant is exposed." (*Alleyne*, at p. 112.) But in *Oregon v. Ice* (2009) 555 U.S. 160 (*Ice*), the high

38

court said the *Apprendi* rule does not apply to facts deemed necessary to the imposition of consecutive as opposed to concurrent sentences, "a sentencing function in which the jury traditionally played no part." (*Ice*, at p. 163.)

As defendant acknowledges, at the time he filed his opening brief on appeal, the issue was pending before the California Supreme Court. Since then, however, the court has decided the issue against him. In *People v. Catarino* (2023) 14 Cal.5th 748, the court held that "section 667.6(d), in requiring that a sentencing court impose 'full, separate, and consecutive term[s]' for certain sex crimes if it finds certain facts, complies with the Sixth Amendment" and that "the rule of *Apprendi* and *Alleyne* does not apply to section 667.6(d) under the rationale of *Ice*." (*People v. Catarino*, at pp. 750, 755, 757.) Accordingly, defendant's claim of constitutional error fails. Given this, we need not address his arguments that the claimed constitutional error prejudiced him.

## DISPOSITION

The judgment is affirmed.

_____

Richman, J.

We concur:

_____

Stewart, P.J.

_____

Miller, J.

*People v. Pineda* (A163880)

40